No. 63.—PETER H. COFFEE, JOHN B. COFFEE, and MARK WILCOX, plaintiffs in error *vs.* JAMES F. NEWSOM, executor of Batts Newsom, deceased, defendant in error.

[1.] It is a general rule that fraud vitiates all contracts.

[2.] Where there has been a fraudulent representation by a vendor to the vendee, with regard to his title to a settlement of land, and the vendee seeks a rescission on that ground, the defect of title must be so great as to render the settlement of land contracted for unfit for the use intended; that portion of the land to which the vendor cannot make title must constitute the main inducement to the purchase.

[3.] Where the vendee went into the possession of a settlement of land purchased of the vendor upon the faith of his represenations as to the title thereto, which representations were false and fraudulent, and known to have been so by the vendor at the time of making them, it was *held*, a court of equity would retain a bill at the instance of the vendee to rescind the contract, notwithstanding the vendee had not been evicted from the possession of the premises, nor abandoned the possession thereof, nor had offered to do so.

This was a bill in equity, brought by the plaintiffs in error, against the defendant in error, to which the latter demurred. The bill was returned to Pulaski Superior Court, and at the April Term, 1847, the demurrer was heard before Judge Scarborough; and after argument it was sustained, and the bill dismissed.

The bill charged, that in August, 1843, the complainants, Peter H. and John B. Coffee, entered into a treaty with the defendant's testator for the purchase of the entire settlement and body of lands, farms, and tenements, then claimed to be owned by him, situate in the counties of Pulaski and Telfair; that in the progress of said treaty, and before the completion of the contract therefor, and to induce them to make the purchase, the said Batts conducted them over and exhibited to them a large body of valuable lands and farms, upon a part of which was located the former residence of said Batts, and various necessary and valuable out buildings and tenements, all of which he represented to them to form, constitute, appertain and belong to the said settlement; that the body of land over and through which the said Batts so conducted them, and which he so exhibited and described to them as being embraced in and constituting said settlement, and to which, and every parcel and lot thereof he had, and could, and would make good and sufficient lawful titles, he represented to consist of the following whole lots of land, in the 14th district of formerly Wilkinson County, one part of which district is now in the said County of Telfair, and the

Coffee and others *vs.* Newsom, Executor.

other part in Pulaski, to wit, Nos. 241, 242, 270, 271, 272, and 300, containing each 202½ acres; also one acre of lot No. 301; also fractional lot No. 330, number of acres unknown; and also the following whole lots of land in said district, in the County of Pulaski, to wit, Nos. 298, 299, 309, 310, 311, 308, 312, and 317, containing each 202½ acres; and also the fractional lots Nos. 313, 314, 315, 318, and 319, the number of acres contained therein not known.

That in the further progress of said treaty, and before the contract was completed, and to induce the complainants to conclude the same, and as a part of the consideration of the contract, the said Batts promised them to leave for them on said premises, and in the contiguous neighbourhood and range, such of his stock of hogs and cattle as he might not succeed in gathering and driving off to Randolph County, his then residence, by the first day of January, 1844; and that of the cattle so to be left, there would be at least thirty head, worth $150, and hogs of the value of $200, or other considerable sums.

That the complainants, Peter H. and John B. not doubting or suspecting, but confiding in the good faith and integrity of the said Batts in describing and showing to them the said settlement of lands, and relying upon his representations as to the location and extent thereof, and as to the legality and sufficiency of his title thereto, the title papers to which he represented as being at his then residence in Randolph county, and which therefore they had *no opportunity to inspect,* and relying also upon his statements and promises in regard to said cattle and hogs, they were induced to enter into a contract for the purchase of said lands; and in pursuance thereof, they, with Wilcox the other complainant as their security, made and delivered to said Batts their two promissory notes for $1,000 each, one to fall due on the first of January, 1844, and the other on the first January, 1845; whereupon the said Batts then executed to them the following bond for titles—

"Georgia, Telfair County. Know all men by these presents, that I, Batts Newsom of the County of Randolph and State aforesaid, am held and firmly bound unto Peter H. Coffee and John B. Coffee their heirs and assigns, in the just and full sum of four thousand dollars, for the true payment of which, I bind myself, my heirs, executors and administrators jointly and severally firmly by these presents. Sealed with my seal, and dated this eighteenth day of August, 1843. Now, the condition of the above bond or obligation is such, that if the above bound Batts Newsom shall,

when the last payment is made, make or cause to be made unto Peter H. Coffee and John B. Coffee, good and sufficient titles *to all his possession of lands lying in the counties of Pulaski and Telfair*, containing two thousand six hundred acres more or less, then the above bond to be void, otherwise to remain in full force.

"BATTS NEWSOM, [L. S.]

"J. D. McNAIR,

"MICHAEL CONALLY, J. P."

The bill further charged, that at the time of the contract the premises were occupied by one William Newsom, the son and tenant of said Batts, who was to remain in possession until the first of January thereafter, when the said premises, with the cattle and hogs aforesaid, were to be delivered to the complainants; that at the time of the contract there was upon and attached to the premises *and embraced in said contract of purchase*, a gin-house with a cotton saw-gin and running gear attached thereto, of the value of four hundred dollars, which said gin-house and running gear (the said Batts having caused the gin to be carried away after said contract,) were by the gross negligence of said Batts, or his tenant or agents, burnt down and destroyed by fire, and which have never been replaced by said Batts or his said executor, though morally and legally bound to replace them.

That in the hope and expectation that said Batts' would repair said loss, or make a fair allowance for the same, that the said cattle and hogs would be left or accounted for, and that he would be able to make or cause to be made good and sufficient titles to all and singular the said premises according to said contract; the complainants on or about the first January, 1844, went into the possession thereof. That shortly after they so went into possession, and while said Batts was in life, he furnished them at their special request to enable them to give in the said lands as a part of their taxable property with the following memorandum, to wit: "201 in the 17th district, pine land, and 241, 242, 270, 271, 272, 300, 311, 310, in the 14th district, and 298, 302, 302, 308, 309, 310, 312, 313, containing 195 acres, and 314 containing 122 acres," stating that number 310 was off Posey's swamp lot and contained *one* acre more or less, the back fence of No. 300 being on the line.

That the complainants were informed and believed that said memorandnm was made out or caused to be made out by said Batts, upon *investigation of all his Pulaski and Telfair title papers to lands therein*, the said memorandum being in the hand writing of

the said executor, and that said memorandum embraced all the lands in Telfair and Pulaski to which said Batts had any title at the time of said contract, or acquired afterwards, and also several lots to which he had not then or at any other time any title, or colour of title ; and that said memorandum of title papers so furnished by said Batts as aforesaid, made no mention of the aforesaid whole lots in the 14th district, to wit: No. 311 of the value of $150; No. 317 of the value of $100; No. 299 of the value of $300; the said last mentioned lot being in the midst of said settlement, or body of land so shown and exhibited as aforesaid, and lying immediately between the dwelling house and some of the fields upon said premises, nor of the said *fractional lots,* to wit: No. 315 of the value of $100; No. 318 of the value of $25; No. 319 of the value of $50.

The bill further charged, that said memorandum contained numbers for which complainants did not contract, and which were not shown nor exhibited to them by the said Batts as part of said settlement, and to one of which, No. 311, in the said 14th district, he never had any title, for that the same was then, and for many years previously had been, owned and cultivated by the complainant Wilcox, without any claim or pretence of title thereto on the part of said Batts.

The bill further charged, that after said contract and their going into possession, they were informed and believed, that the whole lot 308, and fractional lot 315, in said 15th district, were, and for many years previous to said contract had been, owned and claimed by and recognised in the neighbourhood as the property of one John McDaniel, and that the legal, valid, and subsisting title was in him ; and that the said Batts had no title or right to the said lot No. 300, on which there was a field of fifteen or twenty acres, which was shown to the complainants by said Batts as a part of his farm and settlement aforesaid, but the same then belonged to one W. Melrose, of Bibb County, Georgia, whose right and title thereto was paramount to any right, title or claim of said Batts; and which lot, on account of said field and its relative location, was of the value of $200 to said settlement.

The bill further charged, that it was not in the power of the said Batts in his lifetime, nor of his executor since his death, to make or secure to them legal or sufficient titles to the said settlement of lands; and that the lots and parcels of land to which the said executor was wholly unable to make to complainants good and suffi-

cient titles, were of essential importance and value to the said settlement, and the loss of which rendered the residue of said settlement of comparatively little value.

The bill further charged, that the aforesaid representations of the said Batts to induce them to purchase said settlement, he knew at the time were false in the foregoing particulars.

The complainants offered to said Batts in his lifetime, and his executor since his death, to pay said notes upon receiving good titles, after deducting therefrom whatever might be deemed just and reasonable for the loss of the gin-house, gin and running gear, and also the reasonable value of said cattle and hogs; but with which said Batts in his lifetime, and his said executor since his death, refused to comply.

The bill charged the entire inability of said executor to make good titles to a considerable and valuable portion of said lands.

The bill further charged, that said Batts, sold the cattle, which were to be left for them under said contract, to others, and received therefor the sum of $150. The said Batts caused the hogs not gathered and which were to be left to the complainants under said contract, to be destroyed; so that they lost all the benefits derivable under that part of their contract.

The bill showed the subsequent death of the said Batts, and the qualification of the defendant in error as his executor.

The complainants were sued upon their notes given for said settlement of lands, and the cases were pending upon the appeal. They plead to the actions on the notes a partial failure of consideration in terms of the statute, and also a total failure.

The bill concluded with a prayer, that if it should appear to the Court that said executor was unable to make or secure to the complainants good and sufficient titles to said lands, or to any material part thereof, that the Court would decree a rescission of said contract, the bond delivered up to the executor, and his actions at law upon the notes dismissed, and all actions and proceedings thereon to be perpetually enjoined. Or if it should appear that the executor could make or secure to the complainants, Peter H. and John B. good titles, that an account of said damages sustained by them as aforesaid should be taken, and allowed them as a deduction from the amount of said notes.

The defendant in error, by his counsel, filed a general and special demurrer to this bill, which after argument was sustained by the

Court below, and the bill was dismissed upon the following grounds :

First. Because there had been no eviction of the vendees from the premises ; and they were then in possession, and had been for three years, receiving the rents, issues and profits thereof.

Second. Because the complainants no where in or by said bill, in any event, offered to surrender the premises, or abandon the possession, or pay for the occupation thereof.

Third. The prayer of the bill being in the alternative for a rescission of the contract provided it shall appear good titles could not be made to the lands, and in case good titles could be made to the essential part of the settlement, a specific performance with an abatement of the purchase money. In the former case the vendees ought to give up the possession ; in the latter, to pay the money to vendor or his representative, or deposit it in court.

Fourth. Because the bill no where offers to pay any amount of money.

To which decision of the Court below the counsel for the plaintiffs in error excepted.

COLE & WHITFIELD, for the plaintiffs.

HARRIS & HANSELL, for the defendant.

WILLIAM S. WHITFIELD for plaintiffs in error, submitted the following brief :

Counsel for plaintiffs in error, submit the following points and memoranda of authorities relied on to sustain them —

First. We maintain that a false representation made by the vendor in regard to the quantity, location or title of his estate to induce the vendee to purchase, and in which the vendee confided and upon which he acted, (if of a matter of material importance to the purchase,) is a good ground for rescinding the contract. *Neville* vs. *Wilkinson*, 1 *Brown. Ch. R. Perkins Ed.* 475 ; *Boyce's Executors* vs. *Grundy*, 3 *Peters R.* 210 ; *Smith* vs. *Richards*, 13 *Peters R.* 26.

Second. And in such case *suppressio veri* is as fatal as *suggestio falsi.* 1 *Sugden on Vendors*, 5, 7.

And in such case of fraudulent concealment or false representation, it is no objection to the purchaser's right to have the contract rescinded, that he has not been evicted, for " a court of equity is bound to relieve a purchaser from that state of *hazard*

into which the misrepresentation of the seller has brought him." *Edwards* vs. *McLeay*, *Coop.* 308 ; 1 *Sugden on Vendors*, 284.

The case in John. Ch. Rep. which will be much relied on by defendant, admits that fraud forms an exception to the rule, that relief will not be granted where there has been no eviction.   Although there is not a perfect analogy of principle governing applications for specific performance by vendor, and those for rescinding the contract by vendee, yet there is a close affinity. And equity never compels a vendee to accept a doubtful title. *Young* vs. *Lillard*, *Marsh.* 482 ; *Vide Notes to* 1 *Fonbl. on Eq.* 4 *Am. Ed.* 154.

Second. It will be contended that the plaintiffs should not have entered and retained possession under a doubtful and encumbered title.   We answer that vendees had no opportunity to inspect the title papers, nor any notice of the defect of title, until after they had entered into possession.   Vendees entered upon the faith of the same representations on which they had purchased, and with the assent of the vendor.

" A purchaser may, with the concurrence of the vendor, safely take possession of the estate at the time of the contract, as he cannot be held to have waived objections of which he *was not aware.* And if the purchase cannot be completed on account of objections to the title, he will *not be bound to pay rent for the estate,* unless perhaps the occupation of it has been beneficial to him." 1 *Sugden on Vendors,* 9.

Now in this case there is no evidence that the occupation of the premises has been beneficial to vendees.

And it is submitted, that in a case of gross fraud and deception such as this bill discloses, whereby a purchaser is entrapped into a purchase he would not otherwise have made, no rent should in any event be allowed.   It would be allowing the vendor to profit by his fraud, a thing which equity never does permit.

And this it is submitted, is a sufficient answer to the objection that there is no offer in plaintiffs' bill to pay for the use and occupation of the premises.

It will be contended, that at the earliest practicable moment after vendees discovered the defects in vendor's title, they should have communicated the fact to vendor and offered to rescind the contract.

In answer to this we reply, that the bill alleges that soon after the defects of vendor's title came to the knowledge of vendees, to

wit, at October term, 1844, of Pulaski Superior Court, they procured proper pleas to be filed, setting forth the substance of their bill subsequently filed, as a defence to the first action at law commenced against these plaintiffs in error by this defendant in error. And these pleas being matter of record, we maintain were sufficient notice to the defendant in error, that the vendees had discovered material defects in, and were dissatisfied with, the title; and that they were unwilling to complete their contract of purchase unless it should be in the power of the defendant in error to remove the doubt and difficulty which obscured and threatened the title.

It is apparent from the bill that the vendees have all the while been ready and willing, and that they offered to *vendor in his lifetime, in* 1844, and to the defendant in error as his executor, and again repeat the offer by their bill, to complete their contract of purchase, upon the tender to them of good and sufficient titles to the lands purchased.

And therefore, with great respect it is submitted, that the assertion of his Honour the Circuit Judge " that the bill no where offers to pay any amount of money to the defendant " was founded in misapprehension.

But it is further contended that the demurrer was properly sustained, because the vendees " no where in or by said bill in any event, offer to surrender the premises or abandon the possession."

We maintain that no such offer was necessary, that the necessary consequence of rescinding the contract would be, to displace vendees and restore the representative of vendor to the possession of the premises. That such is the object of vendees bill, (if good titles cannot be made to an essential part of the purchase,) is sufficiently obvious although not stated in express terms; and the court would shape its decree accordingly.

The part of the estates purchased, to which the bill alleges vendor had not, and defendant will not, be able to make title, formed a principal part of the inducement to purchase, and is of such essential importance to the estate as to entitle the plaintiffs to a rescission of the contract.

By vendor's own abstract furnished after vendees took possession, he admits he had no title to three whole lots, $202\frac{1}{2}$ acres each, and three fractions, 150 acres each, which the bill charges to be of the value of 725 dollars; over a third *in value and quantity* of the whole purchase; and some of these lots too, in the very heart of the settlement.

It will perhaps be further contended, that all the representations made pending the treaty, were merged in the written contract, and that plaintiffs are seeking by their bill to vary the written agreement.

But such is not the fact. There is no attempt made here to vary the written agreement. The relief is sought upon the ground that by false suggestions and immoral concealment, the vendees were entrapped into a contract in which they would not otherwise have involved themselves. This is not denying that the agreement in the record was the agreement entered into, but insisting that it was vitiated by fraud, which vitiates every thing. 3 *Peters R.* 218, 219.

In this transaction there was no absolute conveyance, no deed containing warranty of title ; but the only assurance given by vendor to vendees was the imperfect bond for titles set forth in the record, and which it is submitted will furnish the vendees no adequate remedy at law, if indeed any remedy at all, since the numbers of the land, the quantity of acres in each number, and the districts wherein situate, are not specified therein.

And vendees charged that they accepted said instrument in its imperfect and defective form, because the title papers of the vendor were then at his residence, in Randolph County, and they had no opportunity to inspect them ; and because of their unqualified confidence in the integrity and representations of the vendor.

The charges contained in the plaintiffs' bill are to be taken as true. And taking the whole case together, the transaction on the part of the vendor was attended with a degree of turpitude which has its parallel in but few cases of the kind to be found in the books ; few cases in which such gross deception, circumvention and fraud have been practiced, and fewer still where purchasers have thrown themselves with such unqualified confidence upon the representations and integrity of a vendor. Every thing was confided, and every thing has been betrayed.

It is believed that no case can be found in the books parallel in its merits, where relief has been denied a purchaser thus overreached by the circumvention and fraud of a vendor.

All of which is most respectfully submitted.

Argument of Iverson L. Harris, for defendant.

The contract for the purchase of the lands was made in August

Coffee and others *vs.* Newsom, Executor.

1843 ; possession given to the Coffees in January 1844, in whom it has continued undisturbed for more than three years and six months before the filing of their bill ; and over two years and six months after knowledge in them of the facts upon which relief is sought.

Whilst the bill states that in consequence of the title-papers of defendant's intestate being in Randolph County at the time of the contract, the number of the lots purchased, &c. could not be included in the bond ; no reason is assigned, no excuse rendered, for their laches in not employing the intermediate time of four months between the purchase and acceptance of possession, in examining the records of deeds, with a view to ascertain the extent of Newsom's title, boundary lines, and quantity or land ; or why they did not require a schedule of lots, &c. constituting the " settlement " purchased, before taking the decisive step of accepting possession.

*Leges subveniunt vigilantibus non dormientibus.*

Gross negligence has been exhibited by complainants. At this late period they come into a court of equity, and ask its aid *in compelling defendant to produce his title-papers that they may be inspected, that he should make or show that he can make good and unincumbered titles ; failing to do this, that there should be a rescission of the contract, and the bond and notes be given up, and the suits against complainants on the notes be perpetually enjoined. Or if titles can'be made, that an account may be taken of the damages sustained in consequence of the non-delivery of cattle and hogs, the burning of the gin-house, &c. and that the amount thereof be allowed complainants, and deducted from their notes.*

Complainants are not entitled to the relief sought, for the following reasons :

First. They have not complied with their contract by the payment of the purchase money, or by an offer to pay it absolutely and without condition or restriction. Such payment is by the contract, a condition precedent. It must be complied with before they can entitle themselves to any discovery as to titles.

The demurrer being good as to the discovery, is good as to the dependent relief.

A court of equity has no power to alter a contract made, or make a contract for parties.

Second. It is an established principle, and of universal applica-

tion, that those who seek equity must do equity.    1 *Story Eq. Jur.* sec. 64.

If the case made by the bill is brought to the test of this principle, it will be apparent that there is no offer of payment by complainants for the use and occupation of the lands purchased and held without molestation for more than three years.

This omission is not a mere amendable defect in the frame of the bill, it is destructive of whatever of equity may otherwise appear upon its face.

Third. In equity no account can be taken of damages arising from *tort.* The averment that the gin-house, " through the wickedness or gross negligence of Batts Newsom, or his agents, was burnt or caused to be burned down," makes a case of *tort,* perhaps of crime.

If a *tort,* the facts must be ascertained and the injury in damages estimated by a jury.

In England such an issue would be sent to a court of law.   In Georgia, the powers of the equity side of the Superior Court not having been enlarged, the jurisdiction of each being the same, such an issue must go also to a jury on the law side.

If the discovery of the arson is insisted on, the demurrer is good thereto; for although Batts Newsom is beyond the reach of punishment here, there is a filial, moral, social, legal duty on the son, to shield the character of the father from the odium of such an imputation.

We know that at law in many cases the *tort* may be waived and the injured party allowed damages upon an *implied* assumpsit. The form of the action of *assumpsit* employed, is the evidence of such waiver.

But here, where the draughtsman employs the strongest and darkest colours to deepen the fraud of defendant's father, and *imputes crime* whilst he demands compensation, it would seem that there was no condonation; if so, why seek to compel the son to accuse the father?

Relief having been prayed specifically and generally, it is apparent that the bill cannot stand as a bill for discovery in aid of their defence at common law.

Another reason concludes it as such a bill, viz. that it is now here alleged that the facts charged are material, and that they rest solely in defendant's knowledge.

It is therefore manifest, from the frame of the bill, that the

answer is uncalled for as necessary and essential evidence to plaintiffs. As a mere pleading it is wanted, to enable the disputed facts to be put in issue.

Will equity open her portals to complainants when they are, *in vinculis* in a court of law, called to answer where they ought to answer, and in which they can defend, if their case and conduct admit of defence, as fully and effectually as in the forum to which they have transferred the litigation? What obstacle is there at law to the proof of a failure of consideration, either total or partial? What to compensation in damages for breach of contract by defendant? That there is *at this time* to a rescission of the contract, is maintainable upon authority. It could once have been rescinded. Why, *early in* 1844, after taking possession, *and when they discovered the fraud* now set up, did they not turn over the possession to defendant as administrator? Why not abandon it, and *promptly give notice that they intended to treat the contract as at an end?* The *parties were then on equal terms*, and *then* there might have been a rescission without complainants' being under the necessity of making compensation for use and occupation, or offering to do equity in relation thereto. See 1 *T. R.* 136.

Laches is punished both at law and in equity by withholding relief.

There might have been a rescission in 1844 at law. See case of *Farrar* vs. *Nightingale*, 2 *Esp. R.* 639.

In this case Lord Kenyon ruled that the buyer of a lease of eight and an half years to run, might treat the contract at an end when it turned out to be only six years, and recover back any money which he had paid in part performance of the agreement.

So too in Chambers *vs.* Griffiths, 1 *Esp. R.* 150, which was the sale of several lots of real property at auction. The purchaser purchased three and paid the money, but the title to two lots failed. Lord Kenyon ruled it to be one entire contract, and if the seller failed to make titles to any one of them the purchaser might rescind the contract and refuse to take the others. So too in *Judson* vs. *Wass*, 11 *John. R.* 525; 2 *Kent Com.* 369.

Nor will "the *case*" made, admit of *compensation*. Based upon alleged fraudulent misrepresentation, the contract will not admit of alteration or modification *pro tanto*, but is destroyed by it entirely. *Viscount Clermont* vs. *Tasburgh*, 1 *Jac. & W.* 112.

The application of the principle of compensation is attended

with such difficulties, that except *in a very clear case* and capable of being made perfectly just, a court of equity hesitates in resorting to it, for the reason, that it too often assumes the appearance and sometimes the reality of making a new contract for the parties. *Hatch* vs. *Cobb*, 4 *John. Ch.* 559; *Kempshall* vs. *Stone*, 5 *John. Ch.* 193.

Compensation cannot be made in any case where a rescission of the contract would not be allowed.

Relief under the *general* prayer must he agreeably to the case made by the bill. *Hobson* vs. *McArthur*, 16 *Peters*, 182; *English* vs. *Foxall*, 2 *Peters*, 595; *Story Eq. P. sec.* 41.

It has been attempted to be shown that the case does not authorize any of the decrees sought by the specific prayers, or under the *general* prayer a decree which looks to the *status quo ante bellum* of the parties, for the lack of the equity in plaintiff's bill which would have entitled them to liberation from the contract. And this is supported by the principle that every averment necessary to entitle plaintiff in equity to relief prayed for, must be contained in the *stating* part of the bill; the defect cannot be supplied by inference or reference to averments in other parts of the bill. *Hood* vs. *Inman*, 4 *John. Ch.* 437; *Harrison* vs. *Nixon*, 9 *Peters*, 503; *Seacraft* vs. *Dempsey*, 15 *Wend.* 83; *Wright* vs. *Dane*, 22 *Pick.* 55.

Under the general prayer the bond for titles cannot be reformed; there is no averment of fraud, accident, or mistake in reference to its obtainment or execution. A court of equity does never interfere for such purpose but upon a distinct allegation of the one or the other, and upon clear proof thereof. *Ex'rs. of Getman* vs. *Beardsley*, 2 *John. Ch.* 274; *Getman* vs. *Moon*, 2 *John. Ch.* 585.

Upon that bond at the proper time, plaintiffs may sue or file a bill for specific performance.

If they should elect the latter, the instrument using the term " settlement " is so vague that it is incapable of being rendered certain, and *until that has been done, there can be no decree.* *Colson* vs. *Thompson*, 2 *Wheat.* 336; 1 *Jacob & W.* 115.

Equity can afford the complainants no relief.

If they should sue upon the covenants in the bond, no evidence extrinsic of the instrument as to the lots of land, quantity, the ginhouse, cattle, &c. would be allowed.

This arises from the frame of the plaintiff's case; it is not for this Court to make a case for them by inference or reference to averments in other parts of the bill so as to afford relief.

Having thus examined the case made by plaintiff, some consid-

eration of the authorities by which it is supported by counsel on this occasion, will show that the principles insisted on in this argument, *are distinctly recognised.*

The case of *Boyce Exrs.* vs. *Grundy*, 3 *Peters*, 210, is very distinguishable from the one before the Court in several essential particulars —

First. Grundy as soon as he discovered the fraud practiced on him, *forthwith gave notice* to Boyce to resume the possession and receive the rents and profits, for that he would not *comply with the contract*, and which notice was repeated to appellants after Boyce's death.

In this case there was no notice to Batts Newsom, and none to his administrator until the filing of this bill, four years after the acceptance of possession; and the use of the " settlement " having continued in them the whole time without molestation.

Second. At the time of the institution of bill of Grundy, there was no suit pending against him in a court of concurrent jurisdiction, and capable of affording all the relief to which he was entitled.

Here suits are pending upon both notes given for the purchase money, and failure of consideration plead.

Third. Relief was extended to Grundy upon his whole contract, upon the ground, that although he might have pleaded fraud at law to the suits on which judgment was had against him on two instalment notes, and although *there* sustained, *still it would have been only a partial* remedy, and therefore inadequate, for the relief would have been only as to $4,000, leaving the other instalments amounting to $16,000, to be defended in a *series of suits.*

Here all the notes are sued; stand for trial on same docket, with same pleas and same witnesses. The defences if successful, will be final as to the *entire* contract, and therefore no reason exists for the interposition of equity.

Fourth. Relief in consequence of the misrepresentations of the quality of the land, &c. was extended to Grundy upon the distinct ground *that he had been prompt in communicating the fraud when discovered.*

Fifth. Boyce was to make a deed of conveyance *in four years* from 3d July, 1818, but had not made it in twelve years, and upon an exhibit of his title at that time it is found defective.

Here defendant stipulates not to make a title *until* the whole purchase money is paid.

Can any legal mind regard the case we have been examining as

furnishing either precedent or principle for plaintiff? The analogy between the two cases is about as close as that of Fluellen's between Monmouth and Macedon.

The case of Smith, appellant vs. Richards, appellee, 13 *Peters R.* also recognises clearly the principle insisted on throughout for defendant, of *prompt action* in rescinding after the discovery of the fraudulent misrepresentations.

It may be dismissed with the remark, that complainant sought relief at once in a court of equity, and whilst no branch of the contract was pending in another court.

The cases of Neville vs. Wilkinson, 1 *Brown Ch. R.* 475, and Allen vs. Abbot, 2 *John. Ch. R.* 519, are dismissed without comment, as they assert principles unquestioned every where. It is difficult to perceive their application to the case here.

C. B. COLE, in conclusion for plaintiffs, argued as follows:

The grounds of equity stated in the bill, and relied on, are the fraudulent and false representations of Batts Newsom in making the sale of the land.

First. The complainants charge, that to induce them to purchase, the said Batts conducted them over a large body of valuable lands, to which he assured them he had a perfect title, and would and could make them a perfect title; that, his title papers being in Randolph County, the complainants had *no opportunity to inspect them, but relied solely upon the representations and integrity of Newsom.*

Second. That complainants went into possession in the hope and expectation that Newsom would deliver the stock and repair the loss by fire, and *that he would be able to make them good title to all the lands purchased.*

Third. The first intimation of Newsom's deficiency of title, and of his bad faith, were received by complainants after they had taken possession, in a memorandum sent by Newsom to them, to enable them to make a return of their taxable property.

Third. This put them upon inquiry, and the result was they found that they had been grossly deceived and imposed upon by the fraudulent misrepresentations of Newsom. And they charge that Newsom knowingly and fraudulently misled and deceived them, and that he fraudulently pointed out to them valuable lands as a part of his settlement of lands, knowing at the same time that he

had no title, nor any expectation or intention of acquiring any, and that his representations were premeditately false aud fraudulent.

Fourth. That the abstract of titles sent them, in order to make up the number of acres in the bond, contains numbers and lots to which Newsom had no title, and which were not pointed out to complainants as part of their purchase.

Fifth. That from the facts charged, complainants believe and charge, that it is not and will not be in the power of the executor to make title to an essential part of their purchase.

Sixth. That complainants have offered, and still offer, to pay the amount of their notes after deducting the damage by fire, and the value of the stock, provided they can get good titles to the lands contracted for, and shown to them as their purchase.

Seventh. The bill charges *that the bond* is *imperfect*. The numbers of the lots, and the districts wherein situated, not being inserted therein, render a recovery on it as impossible.

Eighth. That complainants had no opportunity of inspecting the title papers, and of ascertaining therefrom the numbers and districts, but accepted the bond in that imperfect form, in consequence of the confidence reposed in the statements and assurances of Newsom.

Ninth. That their remedy at law upon said bond would be difficult and inadequate, if not wholly unavailable.

Tenth. Furthermore complainants charge, that the material fact of the capacity to make good titles to the lands sold to them, rests exclusively in the knowledge of the executor, therefore if thrown upon their remedy upon the bond, as the numbers &c. are not set forth, a resort to equity would become necessary to discover the numbers, &c. &c.

The first position I assume is, that in questions of fraud, equity has concurrent jurisdiction with courts of law, and the party defrauded may elect his forum. A court of equity will not force a party to try a question of fraud at law, and more especially when the remedy at law is not as full, ample and complete as in equity. A demurrer admits all the facts charged to be true. The bill charges fraud to have been committed as to the quality, quantity, situation and title to the land. Taking the whole case together, and the charges in the bill, and it is a transaction of gross deception, imposition and fraud. Equity will relieve the party defrauded in such cases, either by rescinding the contract in *toto* or in part, and that, whether there has been an eviction or not. 3 *Peters R.* 210;

58

13 *Peters R.* 26 ; 1 *Story Eq. Jur.* 207, 201, 202 ; ·2 *John. Ch. R.* 519 ; 1 *Brown Ch. R.* 546 ; 1 *Bailey R.* 250, 259 ; 2 *Keen R.* 222 ; *(in* 15 *Eng. Ch. R.)* 2 *Kent Com.* 471 ; *Cooper Eq. R.* 308 ; 14 *Ves.* 144 ; 2 *Scho. & Lef.* 486 ; 2 *Swanst.* 388.

It is a paramount feature and leading object of equity jurisprudence, to prevent multiplicity of suits and vexatious litigation. 1 *Mason R.* 437 ; 8 *Cowen* 31 ; 4 *Wend.* 483.

If a vendor cannot make a good title, he is not entitled in equity to payment of a note given for the purchase money. 2 *Wheat. R.* 13 ; 1 *Haywood R.* 369 ; 1 *Bailey R.* 250, 259.

A purchaser who has accepted a conveyance with special warranty, but has not paid the purchase money, may protect himself in an action for the money, (by a bill) though there has been no eviction. 1 *Bailey R.* 250, 259 ; 2 *Bay R.* 76, 588 ; 1 *Nott & McCord,* 78 ; 2 *Id.* 184, 189 ; 1 *McCord,* 470 ; 1 *Serg. & R.* 438 ; 5 *Id.* 204.

As to fraud, that equity will relieve against, see *Story Eq.* 207, 208, 11, 18.

As to multifariousness in bill, see *Story Eq. Pl.* 382, 397, 409, 412, 414.

As to the land in Telfair, *Story Pl.* 382.

As to whether Wilcox is rightly a party, see *Story Pl.* 397.

*By the Court* — WARNER, J. delivering the opinion.

The complainants seek to be relieved from their contract on the ground of *fraud.*

The record shows that the defendant's testator made gross and fraudulent representations to the complainants, who contracted on the faith of such representations, as it regarded the quality of the land purchased, the location, the number of acres, and the title thereto.

The fraud in the sale of the settlement of land by the vendor, is distinctly charged in the bill, and as distinctly admitted by the demurrer thereto.

Taking the allegations in complainants' bill to be true, a case of more confiding confidence on the one hand, and reckless misrepresentation and fraud on the other, is rarely exhibited in our courts of justice. If.courts of equity are incapable of affording relief under such a statement of facts, then indeed may the name of Justice be considered as a " sounding brass, and a tinkling cymbal."

The Court below refused the relief sought by the complainants, and dismissed their bill, on the ground, that they had not been evicted from the possession of the premises ;. nor had they in their bill offered to abandon the possession of the land, or pay for the occupation thereof. The prayer of the complainants is in the alternative : first, for a rescission of the contract, if in the opinion of the court they should be entitled thereto, and if not, then that an account might be taken of the damages sustained by them on account of the fraudulent conduct and representations of defendant's testator, and the same deducted from the amount of the notes given for the purchase money ; and also the general prayer for relief.

The fraudulent representations were made to the complainants who were dealing upon the faith of them, and who were misled and deceived by the defendant's testator, in relation to the settlement of land in several important particulars.

It is a general rule, that fraud vitiates all contracts. 1 *Story* [1.] *Eq.* 200, 201, 202, 419, 420 ; *Smith* vs. *Richards*, 13 *Peters R.* 26 ; *Camp* vs. *Camp*, 2 *Alabama R. new series*, 632 ; *Bacon* vs. *Bronson*, 7 *John. Ch. R.* 201. In the case last cited the learned chancellor states it as a principle of universal law, that " fraud and damage coupled together, will entitle the injured party to relief in any court of justice."

To what relief were the complainants entitled, according to the case made by their bill ? Are they entitled to a rescission of the contract *in toto*, or to an account and compensation for damages, to be deducted from the amounts of the notes given for the purchase money ?

The defendant's testator represented to the complainants that [2.] he was the owner of, and had title to, several of the lots of land which he contracted to convey as part of the settlement, and that the same were at his residence in the county of Randolph ; when in truth, and in fact, he was not such owner, nor did he have such title, which representation *he knew to be false at the time of making the same.* After examining the authorities upon this subject, Chancellor Kent states the rule with his usual accuracy and precision, which we adopt as a sound exposition of this branch of the law. " The good sense and equity of the law on this subject is, that if the defect of title, whether of lands or chattels, be so great as to render the thing sold unfit for the use intended, and not within the inducement to the purchase, the purchaser ought not to be

held to the contract, but be left at liberty to rescind it altogether." 2 *Kent Com.* 475; *Stoddart* vs. *Smith,* 5 *Binney R.* 355; *Boyce's Exrs.* vs. *Grundy,* 3 *Peters R.* 210. Let this case now be subjected to the test of this rule, and we think it will at once be seen to be clearly within it.

The complainants charge, "that it was not in the power of defendant's testator during his lifetime, and is not and will not be in the power of his executor since his death, to make or secure to them legal or sufficient titles to the said settlement of lands; *that the lots and parcels of land to which the said executor has been, still is, and will be, unable to make to complainants good and sufficient titles, are of essential importance and value to said settlement, and the loss of which will so completely dismember the settlement and body of land so contracted for, as to render the residue thereof of comparatively little value, and defeat the object and expectation of the complainants in making said contract and purchase.*"

The lots of land to which the defendant cannot make title, so completely dismember the settlement contracted for by the complainants, as to render the residue thereof of comparatively little value, and defeats the objects and expectations of the vendees in making the purchase; the main inducement to the making the contract on their part having failed, they are, in our judgment, entitled to a rescission of the contract, unless there is some legal obstacle to prevent the Court making such a decree.

[3.] It is contended that the Court cannot decree a rescission of the contract until there has been an *eviction* from the possession of the premises, or an abandonment of the possession, or an offer to abandon such possession.

All these grounds are embraced in one, and will be all considered at the same time. Can the complainants have a rescission of the contract so long as they remain in possession of the premises? Whatever doubt might exist as regards this question, were the parties in a court of law defending the collection of the notes given for the purchase money, we think the vendees may be relieved in a court of equity. While a court of law would be incompetent to impose terms on the party asking a rescission of the contract, a court of equity assumes and exercises a much broader jurisdiction. Such is the flexibility of courts of equity in adapting their decrees to the actual condition of the parties, that its pervading excellence, in the language of Mr. Justice Story, is, "that it varies its adjustments and proportions so as to meet the very

form and pressure of each particular case in all its complex habitudes." 1 *Story Eq.* 420.

The complainants went into the possession of the premises relying on the faith of the representations made by the defendant's testator; they were ignorant of the fraud practised on them until sometime after they had entered on the premises; there is no fault to be imputed to them, they are the victims of a most unscrupulous fraud, and seek to be relieved from it, and courts of equity will relieve the purchaser in cases of *fraud* before eviction. *Edwards* vs. *McLeary*, 1 *Cooper Eq. R.* 308; same case on appeal, 2 *Swanston R.* 303; *Abbott* vs. *Allen*, 2 *John. Ch. R.* 519; *Young* vs. *Harris, admr. et al.* 2 *Ala. R. new series*, 108; *Whitworth* vs. *Stuckey*, 1 *Richardson Eq. R.* 408.

In *Abbott* vs. *Allen*, the chancellor says: "If there be *no fraud* in the case, the purchaser must resort to his covenants if he apprehends a failure or defect of title, and wishes relief before eviction." Cases of *fraud* were clearly recognised as an exception to the rule established by the court in *Bumpus* vs. *Platner*, 1 *John. Ch. R.* 213, and in the case of *Abbott* vs. *Allen.* In the latter case relief was denied on the ground that there was no *fraud* charged in the bill.

In *Young* vs. *Harris, admr.* Ormond Judge, delivering the opinion of the court, says, " the argument of the counsel for the defendant in error is, that the plaintiff in error is not entitled to a decree rescinding the contract, because he has not been *evicted*, nor abandoned the possession of the land. The decisions of this Court are uniform on this subject when the question has arisen at law, that the vendee, while he retains the possession, cannot refuse to pay the purchase money; otherwise it might happen that he would get the land without paying for it, as a court of law could exact no condition from him as the price of affording its aid. But in a *court of chancery*, where the rights of the parties can be accurately adjusted, no reason is perceived why the vendee, who has been induced by the fraudulent representations of the vendor to invest his money in the purchase of land, should be required as a prerequisite to relief in equity, to relinquish the possession of the land, and with it it may be his only hope of reimbursing himself. This point has not before been presented in this court; but we hesitate not to say, that where one, by the fraudulent silence, or fraudulent representations of another, in relation to material facts concerning the title of land, the falsehood of which he had not the means of ascertaining, and could not have ascertained by reasonable diligence, is induced to

invest his money in the purchase of land, or has made, on the faith of such purchase, valuable and lasting improvements, he can have relief in chancery *before an eviction, and without an abandonment of the possession.*"

In *Whitworth* vs. *Stuckey*, Chancellor Harper delivering the opinion of the court, says: "I do not find that a contract of sale has ever been relieved against, on the ground of an outstanding title while the vendee continues in possession, unless on the score of *fraud.*" At page 410 he remarks, "I have said, that any contract may be rescinded on the score of *fraud;* and such is the case of *Edwards* vs. *McLeary.*" And we will only add, such is the case now before us for adjudication. It is urged in support of the decision of the Court below, that the complainants do not offer to pay for the occupation of the premises. Admitting a court of equity was not competent to adjust the rights of all the parties, in decreeing a rescission of the contract and placing them in *statu quo,* which we do not for a moment suppose, yet in this case, it is a sufficient answer to say, that it nowhere appears on the face of complainants' bill, that the occupation of the premises was worth any thing, or that the complainants have in any manner been benefited thereby. *Sugden Law of Vendors,* 9.

The bill simply states, that the complainants relying on the representations of defendant's testator, went into the possession of the premises; whether such possession has been beneficial or prejudicial to the complainants, whether they have made valuable and lasting improvements on the premises, or whether there was open land which they have profitably cultivated, does not appear; and certainly until it is shown affirmatively that some amount of money was due from complainants to the defendant for the use and occupation of the premises, they cannot be required to offer payment thereof, as a pre-requisite to relief against an undisguised and admitted fraud. Our judgment is predicated on the case as made by the bill and demurrer, and we are all of the opinion that the Court below erred in sustaining the demurrer and dismissing the complainants' bill. Let the judgment of the Court below be reversed, and the cause reinstated.